CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 2 8 2017

JULIA C. DUDLEY, CLERK
BY:
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DOUGLAS FAUCONIER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:16CV301 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HAROLD CLARKE, et al., | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

Douglas Fauconier, a prisoner proceeding pro se, commenced this civil action pursuant to 42 U.S.C. § 1983 against four defendants in their individual and official capacities: Harold Clarke, Director of the Virginia Department of Corrections ("VDOC"); David Robinson, Chief of Corrections Operations at Augusta Correctional Center ("ACC"); John A. Woodson, Warden at ACC; and T. McDougald, member of the Publication Review Committee ("PRC"). Fauconier asserts that defendants are violating his First, Fifth, and Fourteenth Amendment rights guaranteed by the United States Constitution because VDOC Operating Procedure No. 803.2 ("OP 803.2") prohibits him from purchasing or possessing magazines with nude photographs. He seeks injunctive relief and monetary damages. The matter is currently before the court on defendants' motion for summary judgment. For the reasons stated below, the court will grant the defendants' motion.

## Background

VDOC OP 803.2 relates to publications received by prison inmates. The regulation was updated in 2015, and the revised version prohibits inmates "from receiving publications that contain nudity, promote violence, disorder, or the violation of state or federal law; or any material containing sexually explicit acts, including child pornography or sexual acts in violation

of state or federal law." VDOC OP 803.2, Docket No. 33-1. "[O]ffenders are not permitted to send, receive or possess material that emphasizes explicit or graphic depictions or descriptions of sexual acts or contains nudity as defined in this operating procedure." Id. § IV(B). "Nudity" is defined as "[t]he showing (human or cartoon) of the male or female genitals, pubic area, female breast with less than a fully opaque covering of the areola, or male or female buttocks with less than a full opaque covering of the anus." Id. § III. However, publications that contain nudity "illustrative of medical, educational, or anthropological content may be acceptable." Id. § IV(H).

The VDOC implements the regulation in the following manner. When an inmate requests a publication, the Facility Unit Head determines whether the requested publication has already been reviewed and disapproved by the PRC. See id. § IV(D). If the publication has already been reviewed and disapproved, the Facility Unit Head informs the offender of such disapproval. Id. The offender may then appeal the PRC's determination. See id. § IV(F). If the publication has not been reviewed by the PRC, the Facility Unit Head makes a case-by-case determination as to whether to approve or disapprove the publication in accordance with standards set forth in OP 803.2. See id. § IV(D). If the Facility Unit Head disapproves the publication, he or she submits the publication to the PRC for review. See id. If the PRC disapproves the publication, the offender may appeal this determination. If the PRC approves the publication, the publication is sent to the offender. Id. § IV(E).

On March 6, 2015, defendant Robinson issued a memorandum to all VDOC facilities, detailing the new standards and procedures. See Mem. to Facility Unit Heads, Docket No. 33-1. The new prohibition was implemented in phases so that, prior to July 1, 2015, offenders were still permitted to receive orders already placed and cancel existing subscriptions. Id. From July 1

to October 1, 2015, offenders were afforded the opportunity to dispose of any publications that violated VDOC 803.2. After October 1, 2015, publications containing nudity would be considered contraband and would be subject to confiscation. Id.

Defendants have presented evidence demonstrating that the decision to eliminate all publications and commercial photographs that contain nudity arose out of the detrimental effect such materials have on VDOC's public safety mission. See Aff. of Robinson ¶ 6, Docket No. 33-1. Defendants also contend that an inmate's possession and exchange of nude photographs can lead to stealing, fights, assaults, gambling, and other disruptive activities that threaten institutional security. Id. Prior to implementing the revised OP 803.2, the VDOC deliberated for about seven years on how best to address publications containing nudity. Id. ¶ 7.

Fauconier alleges that OP 803.2 prevented him from enjoying his subscription to Playboy magazine. Compl. ¶ 37. He claims that, pursuant to OP 803.2, defendants have intercepted and confiscated six issues of the magazine. Id. ¶ 38. Plaintiff also complains that from October 2015 through April 2016 defendant Woodson and members of the PRC prevented Fauconier from receiving the October 2015 issue of Esquire magazine. Id. ¶ 39. The Esquire issue contains a cartoon depicting nudity. Fauconier appealed the decisions relating to both the Playboy magazines and the Esquire magazine. See id. ¶ 18-31. On April 4, 2016, he received a copy of the October 2015 issue of Esquire as a result of his appeal. Id. ¶¶ 31, 53.

Fauconier makes three arguments in support of his contention that OP 803.2 violates his First and Fourteenth Amendment rights. First, he asserts that the policy is facially invalid in violation of the First Amendment because of its overbroad application. Second, he argues that the policy is unconstitutional as applied to the instant case, also in violation of the First Amendment. Third, he contends that the vague language of the policy leads to arbitrary

enforcement in violation of the Due Process Clause of the Fourteenth Amendment.[1] The defendants have moved for summary judgment, and there is no dispute that Fauconier exhausted his administrative remedies. See Defs.' Br. in Supp. 6, Docket No. 33 ("Fauconier has exhausted his administrative remedies via the inmate grievance procedures."). The issues have been fully briefed and are ripe for review.

## Standard of Review

Summary judgment is properly granted if "there is no genuine dispute as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

### I.   First Amendment Claims

Generally, an inmate retains his rights afforded to him by the First Amendment of the Constitution. See Pell v. Procunier, 417 U.S. 817, 822 (1974). In the prison context, however, an inmate's First Amendment rights must be balanced with other valid penological concerns, such as a prison's institutional needs of security, discipline, and general administration. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Montcalm Publ'g Corp. v. Beck, 80 F.3d 105, 107

---

[1] Fauconier invokes both the Fifth and Fourteenth Amendments. The Fifth Amendment applies to the federal government and the Fourteenth Amendment applies to the states. See, e.g., Dusenbery v. United States, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Thus, the court construes Fauconier's claim as a Fourteenth Amendment claim.

4

(4th Cir. 1996). "[A] prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably related to legitimate penological interests.'" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Whether a prison regulation restricting speech or expression is reasonably related depends on four factors:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates[]"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner, 482 U.S. at 89-92). The prisoner has the burden of disproving the validity of a prison regulation. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Therefore, to defeat summary judgment, Fauconier must demonstrate that the regulation is not reasonably related to a legitimate penological interest or that there is a genuine issue of material fact regarding its applicability to the materials at issue. See Bahrampour v. Lambert, 356 F.3d 969, 973 (9th Cir. 2004) (citing Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001)). In analyzing whether a regulation is reasonably related to a legitimate penological interest, courts are instructed to give deference to state prison officials regarding day-to-day prison operations. See Turner, 482 U.S. at 84-85 (citing Procunier v. Martinez, 416 U.S. 396, 404-05 (1974)).

### A. Whether There Is a Valid, Rational Connection

The first Turner factor the court addresses is whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. In doing so, the court examines the scope of the regulation, its purported content-neutral objective, and the fit between the two. Aiello v. Litscher, 104 F. Supp. 2d 1068, 1075

(W.D. Wis. 2000). In other words, the court must determine whether the "objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (quoting Thornburgh v. Abbott, 490 U.S. 401, 414 (1989)).

First, "[i]t is beyond question that both jail security and rehabilitation are legitimate penological interests." Id. Defendants assert that the regulation was promulgated as a result of their statutory duty to maintain security, discipline, and good order in Virginia correctional facilities. Aff. of Robinson ¶ 4, Docket No. 33-1. The defendants further aver that the "decision to exclude sexually explicit materials and publications containing nudity is aimed at maintaining facility security, rehabilitating offenders, and reducing sexual harassment of female staff." Id.

Plaintiff has put forth no evidence to the contrary, but complains that defendants have not produced evidence of sexual harassment or complaints of staff. However, defendants need not show that specific incidents occurred. "[A] prison superintendent's affidavit, which state[s] that certain regulated material, if not censored, 'could lead to violence . . . ,' [may] constitute[] a sufficient showing of a threat to prison security." Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir. 1993). It is sufficient that a regulation's justification is based on anticipated security problems. Id. Accordingly, the court believes that defendants have asserted legitimate penological interests in jail security, rehabilitation, and reducing harassment of female staff. See Mauro, 188 F.3d at 1059 ("[T]here is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate."); Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) ("The legitimacy of the rehabilitative purpose appears indisputable.").

Second, a regulation is considered "content-neutral" when it furthers an important or substantial government interest "unrelated to the suppression of expression." See Thornburgh, 490 U.S. at 415-16. When prison administrators draw distinctions "solely on the basis of the potential implications for prison security," including preventing fights, the regulations are "content-neutral." Id. Here, OP 803.2 provides a specific and objective definition of nudity. Defendants have asserted that the reasons to exclude sexually explicit materials are aimed at facility security and other legitimate penological interests—not the suppression of speech. Furthermore, prisoners are allowed access to other non-obscene sexually explicit content, as discussed below. This access suggests that the regulation is not aimed at the content of the speech.

Third, the court finds that OP 803.2 is not "so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89-92. In making this determination, "[t]he question . . . is not whether the regulation in fact advances the government interest, only whether the [correction officials] might reasonably have thought that it would." Amatel, 156 F.3d at 199 (citing Nordlinger v. Hahn, 505 U.S. 1, 11 (1992)). In this case, the defendants could rationally believe that there is a connection between sexually explicit and nude images and rehabilitation, preventing harassment of female staff, and reducing various security concerns. See id. (finding a rational link between a regulation that prohibited the distribution of commercial materials that were sexually explicit or featured nudity and the stated goal of rehabilitation). Defendants also note that prison staff complained that reviewing the incoming publications prior to the updated OP 803.2 created an "extremely uncomfortable" and "even hostile" work environment. Aff. of Robinson ¶ 9, Docket No. 33-1. Accordingly, the first Turner factor, requiring a valid, rational

connection between the prison regulation and the governmental interest asserted, suggests that the regulation does not infringe upon the plaintiff's constitutional rights.

### B. Alternative Means

The second Turner factor relates to whether there are alternative means available for exercising the allegedly infringed right. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to correction officials . . . .'" Turner, 482 U.S. at 90 (citations omitted). To apply this factor, the court must identify the right at issue, keeping in mind that "the right in question must be viewed sensibly and expansively." Thornburgh, 490 U.S. at 417. In his pleadings, Fauconier asserts that OP 803.2 prohibits non-obscene sexual expression. Pl.'s Br. in Opp'n 13, Docket No. 37. Understanding this to be the right at issue, it becomes clear that there are alternative means available for exercising the infringed right.

For example, "[p]ublications containing nudity illustrative of medical, educational, or anthropological content may be acceptable." OP 803.2, Docket No. 33-1. To the extent Fauconier asserts a right to nudity, he has access to such. See also Pl.'s Br. in Opp'n 11, Docket No. 37 (complaining that prisoners must view the bare breast of Virtus on the state of Virginia's official seal). Moreover, Fauconier is not complaining that he doesn't have access to written descriptions of sexual content. Plaintiff acknowledges that he has access to non-obscene, sexually explicit material. "[E]ach day prisoners have access to books in the prison library that contain graphic descriptions of sexual acts." Pl.'s Br. in Opp'n 11, Docket No. 37. "VDOC allow[s] prisoners access to some explicit content (such as to view shows with explicit sex scenes on VDOC provided cable stations and network television . . . )." Id. at 13. Accordingly, it

is clear that plaintiff and other prisoners have access to non-obscene sexually explicit content, albeit not subscription publications that defendants aver "can lead to stealing, fights, assaults, gambling, and other disruptive activities by offenders that threaten institutional security and the safety of offenders and staff." Aff. of Robinson ¶ 6, Docket No. 33-1; see also Amatel, 156 F.3d at 201 (finding that regulations prohibiting sexually explicit material satisfied the second Turner factor because the regulations left "the inmate free to enjoy all written forms of smut").

### C. Impact of the Desired Accommodation

Turning to the third Turner factor, "what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources," the court must ask what would be the impact of allowing plaintiff to receive publications containing nudity. In considering this factor, the court relies on the United States Court of Appeals for the Ninth Circuit's en banc decision in Mauro:

> [S]uch access [to various publications, including Playboy magazine,] could lead to bartering of sexually explicit materials and anatomical comparisons which could in turn lead to fights between inmates. These fights jeopardize not only the safety of jail employees, but also other inmates. Moreover, ... allowing ... access to sexually explicit materials would expose the female detention officers . . . to sexual harassment and a hostile work environment.

188 F.3d at 1061-62. After addressing these concerns, the Ninth Circuit then upheld a prison regulation that prohibits inmates from possessing sexually explicit materials that contained frontal nudity. See id.

### D. Whether the Regulation Is an Exaggerated Response

The fourth and final Turner factor the court addresses is whether OP 803.2 is an exaggerated response to the jail's concerns. In making this inquiry, the absence of a ready alternative is evidence of the reasonableness of a prison regulation. Turner, 482 U.S. at 90-91.

9

"[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimus cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91. This is not a "least restrictive alternative test," and the burden is on the prisoner challenging the regulation to show that there are obvious, easy alternatives to the regulation. O'Lone, 482 U.S at 350; see also Casey, 4 F.3d at 1523 ("It is incumbent upon the prisoners to point to an alternative that accommodates their rights at de minimis cost to security interests.") (emphasis in original).

Here, Fauconier argues that employees who feel uncomfortable reviewing the incoming publications can simply ask other mail room employees who are not so offended to review the materials. Fauconier also asserts that the VDOC can ban certain vendors who have attempted to circumvent VDOC procedures by making nude pictures of prisoner's wives and sisters available. Pl.'s Br. in Opp'n 4-5, Docket No. 37. These arguments are unavailing.

First, plaintiff is not seeking access to nude pictures of other inmate's wives and sisters and has not complained that such non-commercial images are unavailable to him. Second, plaintiff's alternatives do not address some of VDOC's rationales for prohibiting publications containing nudity, including the rehabilitation of sexual offenders who, as sexual offenders, are not allowed to possess such publications while on supervised release, and the potential harassment of jail staff. Aff. of Robinson ¶ 7, Docket No. 33-1. Fauconier's suggestions of having different staff review the magazines or of prohibiting certain vendors do not address these concerns. See Friend v. Kolodzieczak, 923 F.2d 126, 128 (9th Cir. 1991) (holding that an inmates' proposed alternative was inadequate where it satisfied some, but not all, of the prison officials' concerns).

10

Additionally, the evidence indicates that the VDOC spent seven years determining the substance of a suitable regulation. See Aff. of Robinson ¶ 7, Docket No. 33-1. The amount of time spent deliberating suggests that the regulation is not an exaggerated response to the existing concerns. Consequently, after analyzing the regulation pursuant to the four factors enunciated in Turner, the court concludes that OP 803.2 "is reasonably related to legitimate penological interests" and does not offend Fauconier's First Amendment rights. Lovelace, 472 F.3d at 199 (citing Turner, 482 U.S. at 84).

The court also notes that many other courts have upheld prison regulations that ban pictorial nudity. See Hoglan v. Robinson, No. 7:15CV00694, 2017 U.S. Dist. LEXIS 40993, at *14 (W.D. Va. Mar. 21, 2017) (Kiser, J.) ("Time and again, courts have upheld correctional officials' policies that have barred full frontal nudity in publications arriving at correctional facilities."); Prison Legal News v. Stolle, No. 2:13CV424, 2015 U.S. Dist. LEXIS 43228, at *13-15 (E.D. Va. Mar. 31, 2015) (surveying existing caselaw addressing "prison regulations on sexually themed material" and noting that "prison and jail administrators can constitutionally restrict pornography and similar 'sexually explicit' writings and photographs"). In Jones v. Salt Lake County, 503 F.3d 1147, 1155-56 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit upheld a regulation that banned "sexually explicit material," including photographs of exposed "breasts and genitals," but did not prohibit "sexually explicit prose or pictures of clothed women/men." Similarly, in Amatel, the D.C. Circuit upheld the federal Bureau of Prison's application of what is commonly known as the "Ensign Amendment." Amatel, 156 F.3d at 214. The Ensign Amendment prohibits the distribution of commercial material in federal prisons that is "sexually explicit" or "features nudity." Regulations promulgated pursuant to the amendment define nudity as "a pictorial depiction where genitalia or

female breasts are exposed." Id. Nude illustrations of medical, educational, and anthropological content are excepted and the regulations promulgated pursuant to the Ensign Amendment do not restrict non-pictorial sexually explicit material. Id. at 194. Applying the four-part Turner test, the D.C. Circuit upheld the regulation and concluded that it supports a legitimate governmental objective: rehabilitation. See id. at 196-97. The court believes that the instant case is akin to Amatel.

**E. Overbreadth**

Fauconier alleges both a facial challenge and an as-applied challenge to OP 803.2. "Facial challenges are disfavored . . . ." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008). There are two ways in which a plaintiff may mount a facial challenge to statute or regulation: by demonstrating that "no set of circumstances exists under which the [regulation] would be valid" or by showing that the law is "overbroad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Id. (citations omitted); United States v. Stevens, 559 U.S. 460, 473 (2010). "[T]he Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application." United States v. Moore, 666 F.3d 313, 318 (4th Cir. 2012) (citing Wash. State Grange, 552 U.S. at 449).

Here, Fauconier contends that OP 803.2 is facially invalid because of its breadth. Namely, he asserts that its broad ban on all nudity constricts constitutionally protected expression, such as possession of non-obscene, sexually-explicit material, as well as speech not protected by the Constitution. See Pl.'s Br. in Opp'n 7, Docket No. 37. As discussed above, the

regulation clearly does not ban all non-obscene sexually explicit material, and Fauconier admits that prisoners have access to alternatives.[2] See Amatel, 156 F.3d at 202 ("[T]he regulation by its terms only restricts pictures; a prisoner may read anything he pleases.") (emphasis in original). Furthermore, "[w]here a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Osborne v. Ohio, 495 U.S. 103, 112 (1990) (citations omitted). Here, Fauconier has not demonstrated a real and substantial overbreadth, especially related to the legitimate security interests advanced by the regulation. Indeed, he received a copy of Esquire magazine after his appeal, demonstrating the lack of overbreadth. Said differently, the regulation satisfies Turner's demand for reasonableness and it is not overbroad.

## II. Fourteenth Amendment Claims

### A. Facial Challenge

Fauconier complains that OP 803.2 is facially unconstitutional because it is ill-defined and leads to arbitrary enforcement in violation of the Due Process Clause of the Fourteenth Amendment. Specifically, Fauconier contends that the regulation is impermissibly vague because it fails to define "emphasizes." See OP 803.2 § IV(B) (prohibiting inmates from receiving or possessing "material that emphasizes explicit or graphic depictions or descriptions of sexual acts").

---

[2] The court notes that the plain language of OP 803.2 does prohibit publications, whether pictorial or written, that emphasize "explicit or graphic depictions or descriptions of sexual acts." OP 803.2, Docket No. 33-1. The facts in the instant case suggest that prisoners have access to printed material and television shows that contain sexually explicit content, and Fauconier does not allege that he or other inmates are prohibited from accessing all forms of sexually-explicit content. His complaint addresses his lack of access to pictorial nudity. Therefore, given the availability of written materials with sexually-explicit content and the lack of complaint as to that prong of the regulation, the court does not address the portion of the regulation related to descriptive, non-pictorial content.

13

Vague rules offend due process by denying a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Hirschkop v. Snead, 594 F.2d 356, 370 (4th Cir. 1979). A prison regulation may be vague and in violation of the Constitution if it "impermissibly delegates basic policy matters to . . . (officials charged with it[s] enforcement) for resolution on an Ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Id. at 370-71 (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)). Vague rules that restrict expression also offend the First Amendment because their uncertain meanings chill freedom of speech. Id. at 371.

The void-for-vagueness doctrine under the Due Process Clause is grounded in the principles of fair warning or notice. Smith v. Goguen, 415 U.S. 566, 572 (1974). The doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). "Thus, all vagueness challenges—whether facial or as-applied—require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006); see also United States v. Hammoud, 381 F.3d 316, 330 (4th Cir. 2004) ("In evaluating whether a statute is vague, a court must consider both whether it provides notice to the public and whether it adequately curtails arbitrary enforcement."). Striking down ordinances as facially vague is disfavored, and a plaintiff challenging the facial validity of a law on vagueness grounds "bears the heavy burden of demonstrating that the law is impermissibly vague in all of its applications." Weigel v. Maryland, 950 F. Supp. 2d 811, 833-34 (D. Md. 2013) (citing Schleifer by Schleifer v. City of

Charlottesville, 159 F.3d 843, 853 (4th Cir. 1998)) (emphasis in original). "Because the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law.'" Farrell, 449 F.3d at 485 (quoting Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 495 (1982)).

First, the court addresses whether the regulation gives adequate notice of what is prohibited. Here, OP 803.2 passes muster. OP 803.2 provides a list of examples of material that "emphasizes explicit or graphic depictions or descriptions of sexual acts" and specifically notes that OP 803.2 "shall not be used to exclude publications that describe sexual acts in the context of a story or moral teaching . . . [or] publication[s] generally recognized as having artistic or literary value." OP 803.2 § IV(H)(A)(1)-(5). Furthermore the remainder of this portion of the regulation sets out a detailed definition of "nudity" and states that inmates simply may not receive publications that contain nudity. See OP 803.2 § IV(B). Finally, the defendants also instituted OP 803.2 in a staggered manner, which allowed prisoners access to certain publications for a "phase out period." Mem. to Facility Unit Heads, Docket No. 33-1. The court therefore concludes that a person of ordinary intelligence would understand what the regulation prohibits. See FCC, 567 U.S. at 253.

Fauconier does not complain that he was not allowed access to material that emphasizes graphic depictions of sexual acts. Instead, his assertions arise out of the fact that prison officials prohibited him from possessing materials that contain nudity. Because the plain language of the regulation clearly states that prisoners may not possess publications that contain nudity, Fauconier cannot claim that he was without notice as to what is proscribed.

Second, the court addresses whether the language of the regulation is sufficiently clear that it provides sufficient guidance to govern prison officials. See Kolender v. Lawson, 461 U.S. 352, 358 (1983) ("[T]he more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.") (citations omitted). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989).

Here, for the same reason that the regulation gives adequate notice of what is prohibited, the court believes that regulation gives sufficient guidance to prison officials. OP 803.2 sets forth clear requirements to guide prison administrators: inmates may not possess content that contains nudity, which is defined in objective detail, and the regulation provides examples of the type of material that "emphasizes explicit or graphic depictions or descriptions of sexual acts." OP 803.2 §§ IV(B), (H)(A)(1)-(5). Moreover, publications are disapproved if they can be "reasonably documented" to violate the standards clearly articulated in the regulation and questionable publications are sent to a neutral third party, the three-person PRC. See Gardner v. Mould, No. 7:12 CV00429, 2014 U.S. Dist. LEXIS 95545, at *23 (W.D. Va. July 14, 2014) (Conrad, J.) (dismissing an inmate's due process claim partially because the publications at issue "were reviewed and disapproved . . . by the PRC as a disinterested party").

### B. As-Applied Challenge

In raising his vagueness challenge, Fauconier is required to demonstrate that the regulation is vague in all of its applications. Weigel, 950 F. Supp. 2d at 832. Here, the regulation prohibits offenders from receiving publications that contain nudity. There is no debate that Playboy magazine contains nudity, and Fauconier was prevented from receiving six issues of

16

Playboy magazine. The application of the regulation to Playboy magazine is clear, and Fauconier therefore cannot sustain his facial vagueness claim as he cannot demonstrate that the regulation is vague in all of its applications.

Nonetheless, the fact that a statute is constitutional as written does not preclude a court from deciding whether the statute has been applied in a particular case in a way as to violate various constitutional provisions. See Hart v. Coiner, 483 F.2d 136, 139 (4th Cir. 1973) (citing Edwards v. South Carolina, 372 U.S. 229, 235 (1963)). At first blush, the fact that Fauconier was granted access to the October 2015 issue of Esquire magazine, which contains a cartoon depiction of nudity, but not the issues of Playboy magazine, because they contain pictorial depictions of nudity, seems somewhat inconsistent. However, "[t]he conscious exercise of some selectivity in enforcement . . . 'is not itself a federal constitutional violation.'" Shue v. Herring, No. 1:04CV1012, 2006 U.S. Dist. LEXIS 73400, at *21 (M.D.N.C. Jan. 12, 2006) (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)); see also Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987) ("[N]ot every divergence in the application [of] a law gives rise to [a constitutional] claim."). "Running a prison is an inordinately difficult undertaking . . . [and] separation of powers concerns counsel a policy of judicial restraint." Turner, 482 U.S. at 84-85. Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132. A regulation "may produce seeming 'inconsistencies,' but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality." Thornburgh, 490 U.S. at 417 n.15.

17

In Thornburgh, the regulations at issue gave individual wardens the discretion to exclude books for content-based reasons from their own facilities. 490 U.S. at 417. Specifically, the regulation allowed a warden to reject a publication "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." Id. at 404. As a result of this regulation, certain inconsistencies were projected to arise across the various facilities. See id. at 417 n.15. The Supreme Court of the United States concluded that such inconsistencies were not fatal because the regulations allowed for facility-specific analysis that accounted for the particular circumstances that each warden faced. See id. at 428.

In this instance, the regulation at issue vests the Director of the VDOC and the Chief of Corrections Operations with the authority to veto a decision by the PRC. See OP 803.2 § IV(E)(3). Fauconier was initially denied access to the October issue of Esquire magazine because it contained a cartoon depicting nudity. Nonetheless, Fauconier received this issue of Esquire magazine after he appealed the adverse decision. Defendant Robinson, Chief of Corrections Operations, granted Fauconier's request "[a]fter further discussion and [because of the] totality of the magazine." See Offender Grievance Response – Level III, Compl. Ex. 7, Docket 1-1.

The court believes that Robinson's actions involved the exercise of discretion of the type that "has traditionally been entrusted to the expertise of prison officials." Hewitt v. Helms, 459 U.S. 460, 470 (1983). The receipt of one magazine containing one cartoon depicting nudity after an appeal of a negative decision regarding access to that magazine simply does not demonstrate that the regulation is impermissibly vague as-applied in this particular case or in all of its applications. Simply put, in light of the regulation's rehabilitative and security purposes, the court cannot find a constitutional violation when Robinson allowed Fauconier to possess one

magazine containing a single cartoon depiction of nudity and, at the same time, Fauconier was denied six issues of a different magazine, which contain numerous depictions of pictorial nudity. See id. ("[T]he safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials."). Instead, Robinson used his judgment to determine that the "totality of the magazine" warranted exception. See Offender Grievance Response – Level III, Compl. Ex. 7, Docket 1-1. Therefore, Fauconier has not met his burden of demonstrating the invalidity of OP 803.2. See Overton, 539 U.S. at 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."). The court will grant the defendants' motion for summary judgment on the merits.

### III. Qualified Immunity

To the extent that plaintiff requests monetary damages, defendants also seek summary judgment on the basis of qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Smith v. Gilchrist, 749 F.3d 302, 307 (4th Cir. 2014). "To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that 'make out a violation of a constitutional right,' or that (2) 'the right at issue was [not] clearly established at the time of' its alleged violation." Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 395-96 (4th Cir. 2014) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). The court need not address the two prongs in order. Pearson, 555 U.S. at 236 ("[W]hile the sequence set forth . . . is often appropriate, it should [not] be regarded as mandatory."). Here, the court has already determined that Fauconier has not shown facts to "make out a violation of a constitutional right," and no further analysis is needed. Id. at 232.

19

## Conclusion

For the reasons stated, the court will grant defendants' motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to plaintiff and counsel of record for defendants. The Clerk is further directed to strike this case from the court's active docket.

DATED: This 28th day of June, 2017.

_____
Chief United States District Judge